# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| PAMELA MCCANTS, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 3:09-cv-01830 (VLB) |
| MICHAEL J. ASTRUE, | : | |
| COMMISSIONER, | : | |
| SOCIAL SECURITY ADMINISTRATION, | : | |
| Defendant. | : | October 21, 2010 |

## MEMORANDUM OF DECISION GRANTING PLAINTIFF'S MOTION TO REVERSE AND TO REMAND AND DENYING DEFENDANT'S MOTION TO AFFIRM [Docs. #12, 13]

The plaintiff, Pamela McCants, filed this action seeking review of the final decision of the defendant, the Commissioner of Social Security, denying her application for a period of disability, disability insurance benefits, and supplemental security income. The plaintiff has filed a motion to reverse the Commissioner's decision and to remand the case [Doc. #12], and the Commissioner has filed a motion to affirm [Doc. #13]. For the reasons given below, the plaintiff's motion to reverse and to remand is GRANTED, and the Commissioner's motion to affirm is DENIED.

## I. ADMINISTRATIVE PROCEEDINGS

The plaintiff alleges that she became disabled on December 13, 2007, at age 43. [Tr. 116] After the plaintiff's application for benefits was denied, she requested a hearing before an Administrative Law Judge ("ALJ"). [Tr. 70-71] ALJ James E. Thomas held a hearing, which consisted of testimony by the plaintiff

and a vocational expert, on March 31, 2009.  [Tr. 20-45]  The ALJ then issued his decision on May 28, 2009, finding that the plaintiff was not disabled.  [Tr. 6-19]

The ALJ applies a five-step sequential evaluation process to an application for a period of disability, disability insurance benefits, and supplemental security income.  First, the ALJ determines whether the claimant is performing substantial gainful work activity.  20 C.F.R. §§ 404.1520(a)(4)(i) & 416.920(a)(4)(i).  If the claimant is not performing such activity, the ALJ proceeds to the second step to determine whether the claimant has a severe medically determinable physical or mental impairment or combination of impairments.  §§ 404.1520(a)(4)(ii) & 416.920(a)(4)(ii).  The impairment must be expected to result in death or must last or be expected to last for a continuous period of at least twelve months.  §§ 404.1509 & 416.909.

If the claimant has a severe impairment, the ALJ proceeds to the third step to determine whether the impairment meets or equals an impairment listed in appendix 1 of the applicable regulations.  §§ 404.1520(a)(4)(iii) & 416.920(a)(4)(iii).  If the claimant's impairment meets or equals a listed impairment, the claimant is disabled.  However, if the claimant does not have a listed impairment, the ALJ proceeds to the fourth step to determine whether the claimant has the residual functional capacity ("RFC") to perform her past relevant work.  §§ 404.1520 (a)(4)(iv) & 416.920(a)(4)(iv).  RFC is defined as the most that a claimant can do despite the physical and mental limitations that affect what she can do in a work setting.  § 416.945(a)(1).  If the claimant cannot perform her past relevant work,

the ALJ proceeds to the fifth step to determine whether the claimant can perform any other work available in the national economy in light of her RFC, age, education, and work experience.  §§ 404.1520(a)(4)(v) & 416.920(a)(4)(v).  The claimant is entitled to disability benefits and supplemental security income if she is unable to perform other such work.  The claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden of proof as to the fifth step.  Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008).

In the present case, the ALJ determined that the plaintiff was not performing substantial gainful activity and had the severe impairments of "affective disorder, fibromyalgia, ACL [anterior cruciate ligament] tear of the right knee and other disorders."  [Tr. 12]  The ALJ then determined that the plaintiff did not have an impairment or combination of impairments that met or medically equaled any of the listed impairments.  [Tr. 12-13]  The ALJ found that the plaintiff had the RFC "to perform light work except that she requires the use of a cane to ambulate and a sit-stand option.  The claimant is limited to performing jobs with few workplace changes and short simple instructions.  Her attention span is restricted but she is able to carry out simple work tasks over a two-hour period before normal breaks and she is precluded from jobs involving high paced production demands."  [Tr. 14]  In light of that RFC, the ALJ determined that the plaintiff could not perform her past relevant work as a machine operator, housekeeper, and bindery factory worker.  [Tr. 16-17]  However, the ALJ found that the plaintiff could perform other jobs such as hand packer, semiconductor

production worker, and production inspector.  [Tr. 17-18]  The ALJ accordingly concluded that the plaintiff was not disabled.  [Tr. 18]

On September 4, 2009, the Commissioner's Decision Review Board notified the plaintiff that it had failed to complete its review of the ALJ's decision within the required ninety days.  [Tr. 1-3]  The ALJ's decision thus became final, and the plaintiff then filed the present case.

## II. STANDARD OF REVIEW

Following the denial of a disability insurance claim, "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.  The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."  42 U.S.C. § 405(g).  See also 42 U.S.C. § 1383(c)(3) (prescribing same judicial review for denials of supplemental security income claims).

"A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error. . . .  Substantial evidence means more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008).  "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's

factual findings must be given conclusive effect so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (citing Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982)).

### III. DISCUSSION

In the present case, the plaintiff argues that the ALJ improperly (1) determined her RFC, (2) gave insufficient weight to the evidence of her mental impairments, (3) assessed her credibility, and (4) failed to consider three of her impairments.

### A. The ALJ's Determination of the Plaintiff's RFC

The plaintiff first challenges the ALJ's determination of her RFC. The plaintiff contends that her testimony at the ALJ hearing was the only evidence in the record relating to her RFC and that her testimony established her inability to work. Therefore, the plaintiff argues that the ALJ incorrectly determined that she could perform light work with specific limitations.

The Court begins with a summary of the plaintiff's testimony before the ALJ. The plaintiff testified that she has an eighth-grade education, that she had had a drug addiction, and that she lives with her husband, who has significant health problems. [Tr. 24, 33, 36] The plaintiff stated that she has poor circulation in her left leg, which caused two ulcers, and extreme pain running from ankle to thigh to hip. [Tr. 27, 36] Although the ulcers healed, they caused her to have difficulty walking, requiring the use of a cane. [Tr. 37] She has a vein protruding from her leg, and two ligaments are missing from her knee, which she broke

approximately twenty years ago.  [Tr. 27]  She also has pain in her elbows, wrists, shoulders, neck, lower back, and hips, and the pain is caused by lying down, sitting, bending, and turning her head.  [Tr. 30]  Shortly after the plaintiff began testifying, she said that she had to stand up because her knees were "getting a little stiff."  [Tr. 27]  Later in her testimony, she stated:  "Right now, my back is hurting so bad."  [Tr. 29]  Thereafter, she testified:  "I'm not trying to be funny, but I am in pain.  Right now my neck and my shoulders and my elbows are on fire . . . ."  [Tr. 35]

The plaintiff explained that she was in constant pain and rated it as a seven on a scale of one to ten, with ten being highest.  [Tr. 28]  She takes the pain medication Neurontin four times per day and muscle relaxants and blood pressure medication once per day.  [Tr. 30]  According to the plaintiff, the medications take approximately half an hour to start working, and they "take away the pain a little."  [Tr. 30]  She rated her pain after taking the medications as a five on a scale of one to ten.  [Tr. 31]  She testified that the side effects of the medications are nausea, vomiting, dryness, headache, and dizziness.  [Tr. 31] The plaintiff also reported having trouble concentrating and experiencing memory loss and fatigue, requiring her to sleep during the day.  [Tr. 31]  She estimated that she has only four good days per month when she can sleep normally and feel "all right" without having to sleep during the day.  [Tr. 34]  She reported being treated for anxiety and depression due to stress and anger.  [Tr. 31] The plaintiff testified:  "[T]hrough the night I have weird dreams.  I feel like

6

some days I just want to throw myself in front of a bus.  And I get angry fast.  I lose concentration."  [Tr. 32]

As to the plaintiff's physical abilities and daily activities, she testified that after ten minutes of sitting her knees lock up, she experiences a burning sensation in her veins and left leg, and "everything seems to stop."  [Tr. 28]  She then tries to improve her circulation by moving a little and bending.  [Tr. 28]  After ten minutes of standing she experiences a burning muscle pain in her knee, which she described as feeling "like somebody taking a sharp object in my joint."  [Tr. 29]  She then needs to move in order to prevent her knee from locking up.  [Tr. 29]  She testified that it takes her "about a good twenty-five minutes" to walk one block if she is using a cane, but she needs to stop and to rest after ten minutes.  [Tr. 29]  She uses public transportation to go to appointments but has missed the bus two or three times because she "can't walk as fast as [she] used to."  [Tr. 34]

The plaintiff spends her day caring for herself and her husband, making sure that they take their medications.  [Tr. 32]  As a result of her pain, she awakens later, cooks less, and cannot iron.  [Tr. 33, 36]  Although she is able to go grocery shopping with her family, she needs their assistance to carry bags up to her third-floor apartment.  [Tr. 33]  She testified that she could lift no more than three pounds daily, but immediately thereafter she testified that she lifted a five-pound pot daily.  [Tr. 34]  She explained that she had difficulty "lifting the [five-pound] pot, opening [the] refrigerator, bending to scrub the toilet, washing the

tub out, [and] making the bed."  [Tr. 35]

Although the plaintiff contends that her testimony at the ALJ hearing was the only evidence in the record relating to her RFC, the Commissioner cites the following medical evidence contained in the record.  First, Dr. Cary R. Freston reported on January 9, 2008 that the plaintiff had full range of motion in her neck, shoulders, elbows, wrists, hands, hips, legs, knees, and ankles.  [Tr. 316-17]  The lesions that resulted from the ulcer on the plaintiff's left leg had healed, but there was mild edema in her left foot.  [Tr. 317]  The plaintiff's gait was initially guarded, but it normalized after several steps, and the plaintiff was able to ambulate normally while wearing shoes.  [Tr. 317]  Dr. Freston noted that the plaintiff did not use an ambulation device, she was not wearing the compression socks that had been prescribed to improve her circulation, and she arrived to the appointment alone by public bus.  [Tr. 315]

Next, Dr. Mohamed Teleb reported on November 26, 2008 that the plaintiff was not in "apparent distress" but had "diffused generalized pain" in her ankles and feet.  [Tr. 356]  The plaintiff's foot pain was mild, her gait was limping, and she had "full active painful range of motion," but there was no sign of trauma or traumatic arthritis.  [Tr. 355-56]  Finally, Dr. Kathryn Goldman indicated on April 7, 2009 that the plaintiff "generally feels good" and her fibromyalgia was controlled by medication.  [Tr. 479]

The medical reports by Dr. Freston, Dr. Teleb, and Dr. Goldman cover the period from the onset of the plaintiff's impairments in December 2007 through the

ALJ's consideration of the case in March, April, and May 2009. Those reports are relevant to the determination of the plaintiff's RFC, and they do not suggest that the plaintiff is completely unable to work. Accordingly, the plaintiff is clearly incorrect that her testimony was the only evidence relating to her RFC. However, the plaintiff also takes issue with the RFC finding. She argues that the finding was incomplete because it did not address the maximum weight that she can lift.

The ALJ found that the plaintiff could perform light work while using a cane and having the option of sitting or standing. [Tr. 14] The ALJ further limited the plaintiff to simple tasks involving short instructions and few workplace changes. [Tr. 14] As the plaintiff points out, "[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). The ALJ did not make an explicit finding as to the plaintiff's ability to lift or carry. The evidence regarding that issue appears to be limited to the plaintiff's testimony that she could lift a five-pound pot with difficulty but could not lift grocery bags. [Tr. 33-34] The record does not contain any RFC assessment forms in which a medical professional is asked to describe the plaintiff's ability to lift or carry. The Court has not located and the parties have not identified any other evidence in the record that addresses the plaintiff's ability to lift or carry. Furthermore, the vocational expert who testified at the ALJ hearing did not address the lifting or carrying requirements of the jobs that the ALJ later determined the plaintiff could perform, namely, hand packer, semiconductor production worker, and production inspector. [Tr. 17-18]

Because those are light work jobs, the applicable regulation presumes that they may involve the lifting of up to twenty pounds at a time and the frequent lifting or carrying of up to ten pounds. § 404.1567(b).

The Court agrees with the plaintiff that the ALJ should have addressed her ability to lift or carry. Therefore, this case must be remanded to permit the ALJ to articulate a finding on that issue. Because the evidence in the record may be insufficient, particularly in light of the absence of an RFC assessment form from a medical professional, the ALJ may choose to seek additional evidence. "Even when a claimant is represented by counsel . . . the social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009).

B. The ALJ's Evaluation of the Plaintiff's Mental Impairments

The Court next turns to the plaintiff's argument that the ALJ failed to give proper weight to the evidence of her mental impairments. The main document at issue is a mental impairment questionnaire completed by Rahel K. Saroff, a licensed clinical social worker, on March 3, 2009. [Tr. 433-38] The questionnaire also bears the signature and stamped name and address of Dr. Ali Hashmi, medical director of Charter Oak Health Center in Hartford. [Tr. 438] The plaintiff testified at the ALJ hearing that Saroff was her "buddy" and "keeps [her] mind stable," but as to Dr. Hashmi, the plaintiff testified: "I don't think I see him." [Tr. 38] Consequently, it appears that Dr. Hashmi approved Saroff's work but did not

actually treat the plaintiff. At the hearing, the ALJ characterized Dr. Hashmi as a "supervising doctor," and the plaintiff appeared to agree, stating that Dr. Hashmi's role was to "[b]asically mak[e] sure that they're doing for [her] what they need to." [Tr. 38]

Saroff wrote on the first page of the questionnaire that the plaintiff had no "significant cognitive deficits" and assigned her a global assessment of functioning score of 60, which indicates moderate symptoms of mental impairment, such as flat affect and circumstantial speech or occasional panic attacks, or moderate difficulty in social or occupational functioning, such as having few friends or conflicts with peers or co-workers. [Tr. 433] Saroff then noted that the plaintiff had decreased energy, generalized persistent anxiety, and difficulty thinking or concentrating. [Tr. 434]

In the assessment of mental abilities and aptitudes needed to do unskilled work, Saroff indicated that the plaintiff was unable to meet competitive standards in two of the sixteen abilities and aptitudes — performing at a consistent pace without an unreasonable number and length of rest periods and dealing with normal work stress. [Tr. 435] "Unable to meet competitive standards" is the second worst of the five ratings from which Saroff could choose. Saroff indicated that the plaintiff was seriously limited, but not precluded in one of the sixteen abilities and aptitudes — completing a normal workday and workweek without interruptions from psychologically-based symptoms. [Tr. 435] "Seriously limited, but not precluded" is third worst of the five possible ratings. In the remaining

thirteen abilities and aptitudes, Saroff decided that the plaintiff was limited but satisfactory, which is the second best of the five possible ratings.  [Tr. 435] These abilities and aptitudes included understanding and remembering procedures and instructions, maintaining attention and attendance, sustaining an ordinary routine, making simple decisions, asking questions, getting along with co-workers and supervisors, responding to changes, and being aware of normal hazards.  [Tr. 435]

In the assessment of mental abilities and aptitudes needed to do semiskilled and skilled work, Saroff noted that the plaintiff was seriously limited, but not precluded in two of the four abilities and aptitudes — setting realistic goals or making plans independently of others and dealing with the stress of semiskilled and skilled work.  [Tr. 436]  Saroff indicated that the plaintiff was limited but satisfactory in the two remaining abilities and aptitudes, which dealt with understanding, remembering, and carrying out detailed instructions.  [Tr. 436]  In the assessment of mental abilities and aptitudes needed to do particular types of jobs, Saroff judged the plaintiff to be limited but satisfactory in two of the five abilities and aptitudes — traveling in unfamiliar places and using public transportation.  [Tr. 436]  Saroff viewed the plaintiff as unlimited or very good in the three remaining abilities and aptitudes of interacting appropriately with the general public, maintaining socially appropriate behavior, and adhering to basic standards of neatness and cleanliness.  [Tr. 436]

Saroff determined that the plaintiff's psychiatric condition exacerbated her

experience of pain or other physical symptoms, noting that "[d]epression and anxiety can mimic fibromyalgia body pain." [Tr. 436] Saroff then assessed the plaintiff's functional limitations, finding that she was moderately restricted in activities of daily living and had moderate difficulties in maintaining concentration, persistence, or pace. [Tr. 437] Saroff indicated that the plaintiff had no more than mild difficulties in maintaining social functioning and that she had not experienced any episodes of decompensation of at least two weeks duration within a twelve-month period. [Tr. 437] The questionnaire defines episodes of decompensation as "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence or pace." [Tr. 437] Despite the absence of episodes of decompensation, Saroff opined that the plaintiff had "a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate." [Tr. 437] Saroff anticipated that the plaintiff's impairments or treatment would cause her to be absent from work about four days per month, but Saroff also wrote a question mark next to the portion of the questionnaire dealing with anticipated absences from work. [Tr. 438]

The ALJ gave "some weight" to the questionnaire "to the extent that it was consistent" with his decision. [Tr. 16] The ALJ offered four reasons for not

assigning greater weight to the questionnaire. First, the ALJ cited the inconsistency between Saroff's assessments that the plaintiff had no significant cognitive deficits and yet moderate difficulties in maintaining concentration, persistence, or pace. [Tr. 16, 433, 437] Second, the ALJ found an inconsistency between the plaintiff's global assessment of functioning score of 60, which indicated moderate symptoms or difficulty in functioning, and Saroff's opinion that the plaintiff was unable "to perform sustained work activity," as the ALJ summarized it. [Tr. 16] As to that opinion, the ALJ did not specify which portion of the questionnaire he had in mind, but it appears that he may have been referring to Saroff's opinion that the plaintiff was seriously limited but not precluded from completing a normal workday and workweek without interruptions from psychologically-based symptoms. [Tr. 435] Third, the ALJ determined that there was an inconsistency between Saroff's view that the plaintiff had limited but satisfactory mental abilities and aptitudes to use public transportation and the plaintiff's testimony that she uses public transportation to go to appointments. [Tr. 16, 34] Fourth, the ALJ viewed Saroff's questionnaire as inconsistent with her initial treatment reports in February and March 2008. [Tr. 16] At that time, Saroff wrote that the plaintiff "is experiencing the strains of being part of the sandwich generation" [Tr. 472-74] and "[g]enerally speaking, [the plaintiff] finds her life demanding." [Tr. 472]

The plaintiff argues that the ALJ failed to follow the treating physician rule when he weighed Saroff's questionnaire. The treating physician rule generally

directs the ALJ to "give more weight to opinions from [the plaintiff's] treating sources . . . . If [the ALJ] find[s] that a treating source's opinion . . . is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, [the ALJ] will give it controlling weight. When [the ALJ does] not give the treating source's opinion controlling weight, [the ALJ considers several] factors . . . in determining the weight to give the opinion." 20 C.F.R. § 404.1527 (d)(2). Those factors are (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) whether the opinion is supported by relevant evidence such as medical signs and laboratory findings, (4) whether the opinion is consistent with the entire record, (5) whether the treating source is a specialist in the relevant area, and (6) any other factors that support or contradict the opinion. § 404.1527(d)(2)(i) through (d)(6).

In the plaintiff's view, the ALJ failed to provide legitimate reasons to assign less weight to Saroff's questionnaire. The Court therefore examines each of the ALJ's reasons. The first issue is whether there is an inconsistency between Saroff's statement that the plaintiff had no significant cognitive deficits and Saroff's assessment that the plaintiff's concentration, persistence, and pace were moderately impaired. The parties resort to a dictionary and pure logic to reach opposite conclusions, and the Court is not convinced that the issue must be resolved one way or the other. The Commissioner points out that the ALJ is

charged with evaluating medical opinions pursuant to § 404.1527(d).  In this instance, the Court concludes that the ALJ reasonably discharged his duty to evaluate.  There could be a discrepancy between finding a moderate impairment of concentration, persistence, and pace and also finding no significant cognitive deficits.  Although a reasonable person could have alternatively found no discrepancy, the ALJ did not commit factual or legal error.

The second issue is whether it was inconsistent for Saroff to assign the plaintiff a global assessment of functioning score indicating moderate symptoms or difficulty in functioning and to opine that her psychologically-based symptoms seriously limited but did not preclude her from completing a normal workday and workweek without interruptions.  The Court determines that the ALJ correctly identified this inconsistency.  Serious psychological symptoms would be expected to lead to a global assessment of functioning score indicating serious rather than moderate symptoms.

The third issue is whether there was an inconsistency between Saroff's determination that the plaintiff had limited but satisfactory mental abilities and aptitudes to use public transportation and the plaintiff's testimony that she uses public transportation to go to appointments.  Saroff's questionnaire included the option of finding the plaintiff seriously limited but not precluded in her ability to use public transportation.  The questionnaire thus contemplates that a person can have the ability to use public transportation while having limitations or even serious limitations in that ability.  Although the plaintiff testified that she uses

public transportation, she did not testify whether she had any difficulties using public transportation on account of her mental impairments. Therefore, the Court does not find an inconsistency and concludes that the ALJ should not have cited this reason in support of his decision to weigh Saroff's questionnaire less heavily.

The last issue is whether Saroff's questionnaire was inconsistent with her initial treatment reports in February and March 2008 stating that the plaintiff "is experiencing the strains of being part of the sandwich generation" [Tr. 472-74] and "[g]enerally speaking, [the plaintiff] finds her life demanding." [Tr. 472] The plaintiff argues that the strains and demands to which Saroff referred may have caused the plaintiff's mental impairments, thus yielding no inconsistency. Having examined the entire record, the Court notes that there is an intake assessment form dated February 5, 2008 in which Saroff diagnosed the plaintiff with "major depressive disorder, recurrent, moderate" and generalized anxiety. [Tr. 377] At that time, Saroff assigned the plaintiff a global assessment of functioning score of 50, which indicated serious symptoms — for example, suicidal ideation, severe obsessional rituals, or frequent shoplifting — or any serious impairment in social, occupational, or school functioning, such as having no friends or being unable to keep a job. [Tr. 377] The plaintiff's intake score of 50 was worse than the questionnaire score of 60 that Saroff assigned after more than one year, indicating some improvement from serious to moderate symptoms or difficulties in functioning. The ALJ did not refer to the intake assessment

form, and it is unclear whether he may have overlooked it.  The form casts doubt on the ALJ's conclusion that the plaintiff was having mostly family problems and not mental problems when she began treating with Saroff.  [Tr. 16]  Therefore, there may not be an inconsistency between Saroff's questionnaire and her initial treatment reports, and the ALJ should have an opportunity to review the issue. Following that review, it is possible that the ALJ could reach the same conclusion as before.  The Court recognizes that an intake assessment form may be based primarily on subjective complaints, and there may be independent reasons to find that those complaints are not credible.

The ALJ properly identified two inconsistencies supporting his decision to give less weight to Saroff's questionnaire:  (1) Saroff determined that the plaintiff had a moderate impairment of concentration, persistence, and pace, but no significant cognitive deficits; and (2) Saroff assigned the plaintiff a global assessment of functioning score indicating moderate symptoms while also finding that she had serious psychological symptoms.  The ALJ improperly cited two other aspects of the questionnaire that do not justify giving it less weight:  (1) Saroff opined that the plaintiff was limited in her use of public transportation; and (2) Saroff referred to the plaintiff's family problems.  As to the latter of those two, the ALJ may have overlooked evidence, particularly Saroff's intake assessment form.  For those reasons, the case should be remanded to allow the ALJ to reexamine the evidence of the plaintiff's mental impairments and then to weigh Saroff's questionnaire in light of the reexamination.

## C. The ALJ's Assessment of the Plaintiff's Credibility

Closely related to the plaintiff's RFC argument is her challenge to the ALJ's assessment that her statements were "not entirely credible." [Tr. 15] The ALJ may decide to revisit this issue on remand after determining whether the plaintiff can lift and carry enough weight to perform light work and whether Saroff's mental impairment questionnaire should be entitled to greater weight. Nonetheless, the Court will proceed to examine the plaintiff's contention that the ALJ's credibility findings were incorrect and lacked specificity.

The assessment of a witness's credibility is entrusted to the ALJ because the ALJ has the opportunity to observe the demeanor of the witness. Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983). As to the credibility of the claimant's complaints of pain, the ALJ first determines whether the claimant suffers from an underlying medical impairment that could reasonably be expected to cause the alleged pain. 20 C.F.R. § 404.1529(b). If so, the ALJ considers the objective medical evidence and other evidence of pain, including (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of pain; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of pain medication; (5) treatment to relieve pain, other than medication; (6) any measures the claimant has used to relieve pain; and (7) other factors concerning the claimant's functional limitations and restrictions relating to pain. §§ 404.1529(c)(2) through (c)(3). The ALJ must evaluate the claimant's statements about the intensity, persistence, and limiting

effects of her symptoms, such as pain, in light of the objective medical evidence and any other evidence. § 404.1529(c)(4). The ALJ must consider whether there are any inconsistencies within the claimant's statements or conflicts between the claimant's statements and the evidence. § 404.1529(c)(4). When the claimant's statements are internally consistent and consistent with the evidence, there is a strong indication that the claimant is credible. Social Security Ruling (SSR) 96-7p, 1996 WL 374186, at *5-*6. The ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Id. at *4.

In the present case, the ALJ determined that the medical evidence did not support the plaintiff's testimony of disabling pain. The ALJ focused on Dr. Freston's report that the plaintiff had full range of motion in the parts of her body in which she alleged pain, that her lesions had healed, that she could ambulate normally, and that she was not wearing her prescribed compression socks. [Tr. 15-16] The ALJ also cited the plaintiff's testimony about her daily activities, which included cooking, caring for her herself and her husband, performing household chores, shopping for food with her family, and using public transportation. [Tr. 16] However, the ALJ acknowledged that those activities "took [the plaintiff] more time due to her physical limitations." [Tr. 16]

The plaintiff argues that the ALJ's credibility assessment was flawed

because it relied primarily on the lack of objective medical evidence, and the absence of such evidence is not sufficient reason to discredit testimony. "As a general matter, objective findings are not required in order to find that an applicant is disabled. . . . Subjective pain may serve as the basis for establishing disability, even if . . . unaccompanied by positive clinical findings [or] other objective medical evidence." <u>Green-Younger v. Barnhart</u>, 335 F.3d 99, 108 (2d Cir. 2003) (citing <u>Donato v. Sec'y of Dep't of Health & Human Servs.</u>, 721 F.2d 414, 418-19 (2d Cir. 1983)).

Although the ALJ based his credibility finding partly on the lack of support for the plaintiff's testimony in the medical evidence, the ALJ also relied on the plaintiff's testimony alone. The ALJ's credibility discussion could have been more detailed, but the message is clear — the ALJ did not believe that the plaintiff could be in completely disabling pain preventing her from working if she was able to perform "most activities of daily living" with extra time. [Tr. 16] The ALJ properly conducted his credibility assessment, but if he revisits it on remand, the Court encourages greater discussion in order to remove the possibility of any doubt as to the findings. For example, the ALJ could have cited the following example in support of his view that the plaintiff was not entirely credible: The plaintiff testified that she could lift no more than three pounds daily, but immediately thereafter she testified that she lifted a five-pound pot daily. [Tr. 34] The ALJ should also acknowledge all of the evidence in the record that relates to the reasons for his credibility finding. For instance, the ALJ relied on Dr.

Freston's report that the plaintiff was not wearing her prescribed compression socks [Tr. 15, 315], but the ALJ did not mention the plaintiff's statements to Charter Oak Health Center in May and June 2007 that she could not afford to buy health insurance or the compression socks. [Tr. 132, 139] Although the ALJ has the discretion to reject the plaintiff's explanation for not wearing the socks, he nonetheless should acknowledge her explanation in his decision.

### D. The ALJ's Consideration of the Plaintiff's Impairments

The plaintiff's last argument is that the ALJ improperly failed to consider three of her impairments — elbow epicondylitis, edema, and venous stasis. As to the elbow epicondylitis, the plaintiff directs the Court to a letter written by Dr. Richard M. Linburg and dated August 31, 2004, which was more than three years before the plaintiff's disability onset date of December 13, 2007. [Tr. 222] Dr. Linburg reported that the plaintiff had "difficulty grasping, squeezing, pushing and pulling." [Tr. 222] When Dr. Freston examined the plaintiff on January 9, 2008, he indicated that "[t]here was pain on grip maneuvers of the hands. However, pincer grasp, dexterity, and transfer is intact throughout." [Tr. 316] Dr. Freston also noted that the plaintiff had unlimited range of motion in her elbows. [Tr. 316] The plaintiff recognizes that the record lacks further medical evidence relating to her elbow epicondylitis.

Although the ALJ did not devote a section of his decision to the plaintiff's elbow epicondylitis, the ALJ discussed Dr. Freston's report that the plaintiff had unlimited range of motion in her elbows, experienced pain on grip maneuvers of

the hands, and had intact pincer grasp, dexterity, and transfer.  [Tr. 15-16]  The ALJ also heard the plaintiff's testimony regarding her elbow pain.  [Tr. 30, 35]  The ALJ indicated in his decision that the medical evidence, particularly Dr. Freston's report, did not support the plaintiff's testimony of disabling pain.  [Tr. 15]  The ALJ also determined that the plaintiff was not entirely credible in light of her ability to perform daily activities.  [Tr. 16]  Therefore, the Court is convinced that the ALJ considered and rejected the claimed severity of the plaintiff's elbow epicondylitis.  The evidence relating to that impairment is sparse, and it is reasonable to accept the ALJ's assessment of it.

As to the plaintiff's edema and venous stasis, which primarily affected her left leg and foot, Dr. Freston examined the plaintiff's left leg and found that her lesions had healed.  [Tr. 317]  He characterized her foot edema as "intermittent," "minimal," and "mild," explaining that it caused a "mild gait abnormality" that was alleviated when the plaintiff was wearing shoes.  [Tr. 315, 317]  The plaintiff's venous stasis was noted by a podiatrist on February 21, 2006, which was nearly two years before the plaintiff's disability onset date.  [Tr. 161]

The ALJ discussed the plaintiff's leg and foot impairments throughout his decision, referring to Dr. Freston's report about the plaintiff's healed lesions and mild edema.  [Tr. 12, 15-16]  The ALJ also noted the plaintiff's testimony regarding her poor leg circulation, which is the definition of venous stasis.  [Tr. 15]  Therefore, the ALJ considered and rejected the claimed severity of the plaintiff's edema and venous stasis.  The plaintiff has failed in her argument that the ALJ

overlooked those impairments.

## IV. <u>CONCLUSION</u>

The plaintiff's motion to reverse and to remand [Doc. #12] is GRANTED, the Commissioner's motion to affirm [Doc. #13] is DENIED, and the case is REMANDED to the ALJ for the purposes of (1) determining whether the plaintiff can lift and carry enough weight to perform light work, (2) reviewing the evidence of the plaintiff's mental impairments, especially Saroff's intake assessment form, and then weighing Saroff's mental impairment questionnaire in light of the review, and (3) reassessing the plaintiff's credibility, if necessary.  The Clerk is directed to CLOSE this case.

IT IS SO ORDERED.

_____/s/_____
Vanessa L. Bryant
United States District Judge


Dated at Hartford, Connecticut:  October 21, 2010.